In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2223

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANGELA L. JACKSON,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 643--Charles R. Norgle, Sr., Judge.


Argued January 19, 2000--Decided April 3, 2000


  Before BAUER, CUDAHY, and EVANS, Circuit Judges.

  EVANS, Circuit Judge.  This case is about a
tragic waste of talent. Angela Jackson probably
would be sitting in a comfortable law firm today-
-instead of doing time in a federal penitentiary-
-if she had devoted as much energy to her legal
studies as she did trying to rip off the United
Parcel Service in a bizarre and elaborate scheme
that included sending hate mail to a number of
prominent African-Americans. Her activities led
to a bevy of federal charges, and a jury found
her guilty on every count in the indictment.
Today, her appeal is up for consideration.

  In 1996-1997 Jackson (a young African-American
woman) was enrolled at the William Mitchell
College of Law in St. Paul, Minnesota. She
previously lived in Chicago for several years
while working and attending the Chicago-Kent law
school. In the fall of 1996 Jackson and a friend
incorporated a business that planned to sell
prints and paintings depicting African-American
culture. She purchased several prints from
Chicago artist Bayo Iribhogbe for a total of
$2,000. She then sent Iribhogbe four United
Parcel Service mailers preaddressed to her St.
Paul address and on which she had written in bold
letters "Kwanzaa," an African-American holiday.
Iribhogbe packed his artwork in the mailers and
sent them off.

  UPS delivered the packages to Jackson's St.

Paul apartment building on December 4, 1996. The UPS driver, the apartment building's receptionist, and the apartment building's concierge who handed the packages directly to Jackson all testified that there were four packages and that none were damaged or defaced. Jackson, however, reported to UPS that she had received only three packages and that all were damaged and contained racial epithets. Though she had paid only $2,000 for the artwork, though her company had received no orders for the art, and though Iribhogbe never previously sold a single print for more than $15, Jackson filed a $572,000 claim with UPS. When UPS balked, Jackson faxed letters to various African-American officials, claiming that "racist elements" within UPS were responsible for defacing her packages and for refusing to compensate her.

That evidence alone might well have been enough to convict Jackson of the fraud charges that were ultimately filed against her, but there was much more. Much more. On December 3, 1996, a search of federal cases and statutes for the words "united," "parcel," "service," "damaged," and "packages" in the same paragraph was done on the LEXIS-NEXIS research service on Jackson's computer under the LEXIS password of Jacqueline Whittmon. Whittmon testified that when she worked in the Chicago-Kent law library she gave Jackson her password, that she never used her LEXIS password after leaving her position at Chicago-Kent in the spring of 1996, that Jackson called her from Minnesota in the fall of that year to ask if her LEXIS password still was activated, and that she never gave her password to anyone else. Also gleaned from Jackson's computer was evidence that it was used in November of 1996 to search the Internet for "white supremacy" organizations and to visit the web sites for the "Euro-American Student Union" and the "Storm Front," two such groups.

On November 25, 1996, seven letter packs were placed in a UPS mailing box in Chicago that were addressed to  three African-American members of Congress, two African-American newspapers in Washington, D.C., the NAACP, and the Rainbow Coalition. The Euro-American Student Union's address was listed as the return address. The packages never were delivered because the UPS driver noticed racial slurs on the outside of the items and turned them over to his supervisor. UPS opened the packages and inside found racially offensive materials under the UPS logo. On that day, Jackson made a withdrawal from an ATM machine located next to the UPS drop box. A piece of paper with the UPS billing identification number for these packages later was found in Jackson's apartment and Jackson initially gave

that number when she called UPS in December to complain about her allegedly defaced packages.

On December 22, 1996, letter packs were dropped in a UPS mailing box in Chicago addressed to 14 African-American individuals, including the Reverend Al Sharpton, NAACP president Kweisi Mfume, the Reverend Jesse Jackson, Representative Jesse Jackson, Jr., Representative Bobby Rush, other members of Congress, former Department of Justice Civil Rights Division head Deval Patrick, New York state comptroller H. Carl McCall, and the defendant herself. These packages also contained racial epithets under the UPS logo. Seven of the packages listed Storm Front as the sender. Jackson had flown into Chicago that day and had rented a car during a layover at the airport. Although Jackson did not receive her package until January 6, 1997, she called Rush's office on December 30, 1996, to report that she had received hate mail from Storm Front.

On January 3, 1997, McCall received another package--sent under the same UPS account number as the December 22 mailings--that contained racial slurs and prompted McCall's wife to summon the New York Police Department bomb squad. On March 31, 1997, seven more packages with racially offensive materials under the UPS logo were dropped at a Chicago UPS drop box and were sent to the artist Iribhogbe, two government offices, and four African-American members of the House of Representatives.

Records and testimony at trial also indicated that Jackson enrolled a UPS employee in the National Rifle Association, sent Confederate flags to a UPS employee, and placed telephone calls, telegrams, and ordered merchandise that attempted to connect UPS employees to white hate groups.

In June 1998 the government filed a motion alleging that Jackson had created false email correspondence on May 20, 1998, that attempted to frame David Stennett, the head of the Euro-American Student Union, for the hate mail. Evidence at the trial showed that Jackson subsequently tried to create an alibi by altering and falsifying records to make it appear that she was being treated at Meharry Medical Clinic in Tennessee on May 20, 1998, when she actually was treated there on other dates.

Before any of these events, Jackson was arrested for battery in June 1996 by Chicago Police Sergeant Bernadette Heelan. After the arrest and before her court date, Jackson used her credit card to order bottles of wine, Playgirl magazine, and sex toys that were

delivered to Heelan's home. Jackson then filed a complaint with the Internal Affairs Division of the Chicago Police Department accusing Heelan of stealing her credit card number during the arrest and using it to make these unauthorized purchases. A piece of paper found in Jackson's apartment contained Heelan's name and address, the telephone numbers of the wine companies, and the words "Sex Devices."

The guilty verdicts against Jackson were returned on five counts of mail fraud, four counts of wire fraud, and one count of obstruction of justice. The presiding judge, Charles R. Norgle, Sr., sentenced her to 60 months in prison on the fraud charges and concurrently to 65 months in prison on the obstruction of justice charge. Jackson appeals her conviction on the eight fraud counts involving UPS on the grounds that Judge Norgle excluded admissible evidence, and she appeals her conviction on the one fraud count involving the Chicago police sergeant on the grounds that it was improperly joined with the rest of the case. Curiously, she does not attack the obstruction of justice charge, for which she received the stiffest sentence.

Jackson's defense is that she didn't do it--in other words, the original four packages sent to her actually were damaged and defaced by UPS and the hate mail really was sent by white supremacists. She says her defense was stymied, however, by Judge Norgle's refusal to allow Stennett to testify and the judge's refusal to admit postings from the web sites of the white supremacy groups. We review the exclusion of evidence for abuse of discretion. United States v. Wiman, 77 F.3d 981, 985 (7th Cir. 1996).

Before trial the government represented that Stennett knew nothing about these crimes and moved to preclude Jackson from calling him as a witness absent a preliminary good-faith showing as to the substance of his testimony. The defense failed to set forth the substance of Stennett's anticipated testimony, saying only that Stennett would be questioned about the UPS packages and the email sent in his name. Because Stennett's denial of any involvement would not have aided Jackson's defense, the only conceivable purpose in calling him would be to air his odious views before the jury. However, a witness may not be called simply to bring in evidence through impeachment that would be otherwise inadmissible. See United States v. Kane, 944 F.2d 1406, 1411 (7th Cir. 1991); United States v. Medley, 913 F.2d 1248, 1257 (7th Cir. 1990). In fact, because Jackson never made known the substance of the evidence Stennett would have provided, the

exclusion of this evidence cannot have been error. See Federal Rule of Evidence 103(a)(2).

Jackson's brief makes casual mention of the court denying costs for "certain key out-of-town witnesses," and at oral argument Jackson's counsel briefly referred to Sharon Nault, who allegedly saw Jackson receive hate mail. This argument would not succeed even if it were sufficiently developed for us to consider. Such testimony would hardly have turned the tide against the flood of evidence against Jackson, and so its absence can only be chalked up as harmless error, if it was error at all.

Jackson also wanted to bring in web site postings from the Euro-American Student Union and Storm Front. Jackson's appeal is imprecise about exactly what evidence she wanted to introduce, but she apparently means web site postings in which the white supremacist groups gloat about the Jackson case, take credit for the racist UPS mailings, discuss the McCall bomb scare, report that a group member traveled to Chicago to mail the November 25 packages, and note that the November 25 packages were confiscated. The government says the evidence was properly kept out because it was prejudicial, irrelevant, hearsay, and lacked foundation.

The vile and inflammatory nature of these racist rants might have distracted a jury. On the other hand, the government already had touched upon the supremacists' loathsome views while presenting the evidence that Jackson had visited their web sites, and those additional details might not have been all that prejudicial. Whether any probative value of the web postings would have been substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403 is a close call and, given the standard of review, one on which we are not inclined to second-guess the trial judge on the front line.

The government contends that this evidence is irrelevant because it is not true, arguing that Jackson concocted these documents and posted them on the supremacists' web sites in an attempt to cover up her crimes. Under this novel theory of relevance, defense evidence should be excluded whenever the prosecution pronounces it phony. Sorting truth from fiction, of course, is for the jury. "[A] judge in our system does not have the right to prevent evidence from getting to the jury merely because he does not think it deserves to be given much weight." Western Indus., Inc. v. Newcor Canada Ltd., 739 F.2d 1198, 1202 (7th Cir. 1984). The government makes more headway in pointing out that the fraud charges stem not from

the hate mail, but from Jackson's claim of damaged packages. Evidence that Jackson was sending fake hate mail under the UPS logo to make the company appear racist was relevant to proving the falsity of her claim that UPS defaced her packages with racial slurs. But if someone else actually sent the fake hate mail under the UPS logo, that would have little relevance to the veracity of Jackson's claim that someone at UPS defiled her packages.

The web postings were not statements made by declarants testifying at trial, and they were being offered to prove the truth of the matter asserted. That means they were hearsay. Fed. R. Evid. 801. Jackson tries to fit the web postings in as a hearsay exception under Federal Rule of Evidence 803(6) as business records of the supremacy groups' Internet service providers. Internet service providers, however, are merely conduits. The Internet service providers did not themselves post what was on Storm Front and the Euro-American Student Union's web sites. Jackson presented no evidence that the Internet service providers even monitored the contents of those web sites. The fact that the Internet service providers may be able to retrieve information that its customers posted or email that its customers sent does not turn that material into a business record of the Internet service provider. "[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretations of the hearsay exception rules." St. Clair v. Johnny's Oyster & Shrimp, Inc., 76 F. Supp.2d 773, 775 (S.D. Texas 1999).

Even if we are wrong about the web postings being unfairly prejudicial, irrelevant, and hearsay, Judge Norgle still was justified in excluding the evidence because it lacked authentication. See Fed. R. Evid. 901. Jackson needed to show that the web postings in which the white supremacist groups took responsibility for the racist mailings actually were posted by the groups, as opposed to being slipped onto the groups' web sites by Jackson herself, who was a skilled computer user. "[C]omputer data compilations are admissible as business records under Fed. R. Evid. 803(6) if a proper foundation as to the reliability of the records is established." United States v. Briscoe, 896 F.2d 1476, 1494 (7th Cir. 1990). Even if these web postings did qualify for the business records hearsay exception, "the business records are inadmissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." United States v. Croft, 750 F.2d 1354, 1367 (7th Cir. 1984). Jackson was unable to show that these postings

were authentic.

In addition to her evidentiary complaints, Jackson says the one fraud count concerning Heelan, the Chicago police sergeant, was improperly joined with the eight counts of fraud and the one count of obstruction of justice concerning UPS. Whether joinder is proper is reviewed de novo. United States v. Jamal, 87 F.3d 913, 914 (7th Cir. 1996). Federal Rule of Criminal Procedure 8(a) allows the joinder of offenses that "are of the same or similar character." Judicial efficiency motivates a strong policy preference in favor of joinder and offenses should be compared for categorical, not evidentiary, similarities. United States v. Alexander, 135 F.3d 470, 476 (7th Cir.), cert. denied, 119 S. Ct. 136 (1998). Because the charge against Jackson pertaining to Heelan, attempted fraud in violation of 18 U.S.C. sec. 1341, is identical to the charge against Jackson pertaining to UPS, joinder was proper. See Jamal, 87 F.3d at 914.

Jackson did not contend that the Heelan count should have been severed, the usual twin argument to a misjoinder claim, but such an argument would have been to no avail. Fed. R. Crim. P. 14 provides for severance if the defendant would be prejudiced by the joinder of offenses. There always is some danger of cumulative prejudice when offenses start getting stacked up against a defendant, but the real hazards of multiple charges are jury confusion or jury bias if it hears evidence about crime B that it would not have heard if it only were considering crime A. The jury would have had no trouble keeping straight Jackson's attempt to discredit Heelan from her attempts to smear UPS. Because Jackson took the stand to deny the UPS ploy, the evidence about her efforts to set up Heelan would have been admissible on cross-examination under Federal Rule of Evidence 608(b) anyway. Even if Jackson had not testified, her modus operandi was so unusual that the Heelan evidence would have been admissible in a trial on the UPS charges under Federal Rule of Evidence 404(b).
For these reasons, the judgment of conviction of Jackson is AFFIRMED.