# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 10, 2015 Session

## STATE OF TENNESSEE v. VERMAINE M. BURNS

**Appeal from the Circuit Court for Williamson County**
**No. II-CR0026236     James G. Martin, III, Judge**

─────────────────

**No. M2014-00357-CCA-R3-CD - Filed May 5, 2015**

─────────────────

Vermaine M. Burns ("the Defendant") was convicted of several sexual offenses, all stemming from illicit Facebook chats ("chats") and emails between himself and the victim, K.P.[1]  On appeal, the Defendant raises three issues: (1) whether the trial court abused its discretion by admitting into evidence the Defendant's chats with the victim and an emailed photo of a penis; (2) whether the evidence was sufficient to support the jury's finding that the Defendant was the author of the communications; and (3) whether the trial court erred by prohibiting the Defendant from referring to a fake Facebook profile created by the Defendant's stepdaughter.  After a review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Carrie Searcy (at trial and on appeal) and Carla Arevalo (at trial), Nashville, Tennessee, for the appellant, Vermaine M. Burns.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Catherine White, Assistant District Attorney General, for the appellee, State of Tennessee.

─────────────────

[1] It is the policy of the Court not to identify a minor victim of a sex crime by name.

**OPINION**

**I. Factual and Procedural Background**

The Williamson County Grand Jury indicted the Defendant for four counts of solicitation to commit aggravated statutory rape, two counts of attempted solicitation of sexual exploitation of a minor, one count of solicitation to commit especially aggravated sexual exploitation of a minor, and one count of exploitation of a minor by electronic means.[2]

At trial, the victim's mother, Melanie Conley, testified that the Defendant was her cousin. At the time the offenses occurred, both the Defendant and K.P. had Facebook accounts, and Ms. Conley was a "Facebook friend[]" with the Defendant.

In June 2010, Ms. Conley received an email from Facebook[3] containing a message that had been sent to K.P.'s Facebook account from the Defendant's Facebook account, asking K.P. to take pictures of her body and to send them to the author of the message. Upset, Ms. Conley looked at K.P.'s computer where K.P.'s Facebook account was still open. There, Ms. Conley found more messages of a similar nature and replies from K.P. indicating that "she was uncomfortable" doing the things she had been asked to do.

Ms. Conley took a screen shot[4] of the messages on K.P.'s Facebook account. Each message bore the name and photo of the Defendant. The last conversation was time-stamped 12:25 a.m. Ms. Conley understood the messages captured in the screen shot to indicate that K.P. had sent the photos of herself and the author was asking if K.P. wanted a photo of himself. In this conversation, K.P. gave her Yahoo email address (the "Yahoo email address" or "Yahoo account"), and Ms. Conley confirmed that the given email address was consistent with Ms. Conley's memory of what K.P.'s email address was at the time. Ms. Conley confronted K.P. about the messages. She also confronted the Defendant, and "things got heated." Later that same day, Ms. Conley contacted the Spring Hill Police Department, who took possession of K.P.'s computer.

On cross-examination, Ms. Conley stated that the Defendant became aggressive when

---

[2] K.P. was 14 years old when the offenses occurred, and the Defendant was more than 10 years older than the victim.

[3] Ms. Conley explained that K.P.'s Facebook account was set up so that an email was sent to Ms. Conley's email address every time K.P. received information over Facebook.

[4] A "screen shot" is an image of a computer screen as it appeared at the time the screen shot was taken.

she confronted him about the messages. Ms. Conley stated that she knew K.P. and the Defendant were "Facebook friends" at the time of the offense. She also knew the Facebook account sending the messages belonged to the Defendant. When asked if she had told anyone that she believed that someone other than the Defendant could have sent the messages, Ms. Conley responded, "I did say that I wasn't sitting there beside the person who sent it, so, I mean, it's a possibility." Apart from the messages found on K.P.'s Facebook account, Ms. Conley had never seen the Defendant make any inappropriate comments or behave inappropriately toward K.P.

Detective Michael Foster of the Spring Hill Police Department testified that K.P.'s mother gave him the screen shot of the chat between K.P. and the Defendant. He also took possession of the victim's laptop computer and brought it to the Franklin Police Department Internet Crimes Against Children task force ("ICAC")[5] in order for ICAC to "perform an image" of the hard drive on K.P.'s computer.

Detective Foster, along with other ICAC officers, executed a search warrant at the Defendant's home. Detective Foster participated in an interview of the Defendant during the execution of the search warrant. During that interview, the Defendant told officers that he did not have his own internet connection and instead used an unsecured network in the neighborhood. He also admitted to having a Facebook account as well as a Hotmail email address (the "Hotmail account" or "Hotmail email address"). He informed the detectives that he used his Facebook account to play a game called Mafia Wars.

To assist ICAC, Detective Foster subpoenaed records for both the victim's Yahoo account and the Defendant's Hotmail account. The records for both accounts showed who created the account and included a "log in history" for June 2010, which detailed the dates and times that the account was accessed along with the internet protocol ("IP") addresses used to access the account. Detective Foster explained that, whenever a computer accesses the internet, it has a signature IP address, which is attached to an internet service provider. That IP address can then be used to determine the exact location of the computer at the time it accessed the internet (e.g., a person's home or a Starbucks).

On cross-examination, Detective Foster admitted that he could not determine from looking at the screen shot of the chats who had accessed either of the two accounts when the chats were sent. Detective Foster also confirmed that the Defendant was "very cooperative" when they executed the search warrant, and the Defendant denied ever sending photos or "chatting" with K.P.

---

[5] Detective Foster explained that ICAC had more experience investigating these types of cases and the Spring Hill Police Department did not have the necessary resources to retrieve evidence from the laptop.

ICAC Detective Stephanie Cisco participated in the execution of the search warrant on the Defendant's home and was tasked with photographing the rooms of the home and collecting evidence. At the time the search warrant was executed, the Defendant was the only person in the home. In the master bedroom, Detective Cisco found a computer that was turned on with the Defendant's Hotmail open on the screen, several cell phones, and a T-Mobile cell phone bill. Additionally, a résumé found on the computer listed the Defendant's name, the Hotmail email address, and the Defendant's cell phone number.

One of the cell phones recovered was a T-Mobile Blackberry. When Detective Cisco found the phone, it was turned on, and if one of the buttons on the phone was pressed, a photo of the Defendant's face appeared as the background for the phone's screen. A T-Mobile cell phone bill found at the scene indicated that it was a statement for a Blackberry owned by the Defendant and contained the Defendant's telephone number.

Detective Cisco examined the Blackberry at the ICAC lab and found a subscriber identity module ("sim") card[6] and a micro SD card[7] inside the phone. The micro SD card contained pictures of the Defendant. Additionally, the Hotmail email address appeared at the bottom of the Blackberry's screen. Detective Cisco explained that the presence of that email address on the screen meant that the Hotmail account was registered to that Blackberry and any email sent to the Hotmail account would automatically appear on his phone. Detective Cisco confirmed that the Hotmail account registered to the phone was the same account that was open on the computer found in the master bedroom of the Defendant's home. Detective Cisco then turned the phone over to another detective in order to retrieve information that had been deleted from the phone's memory prior to its examination.

On cross-examination, Detective Cisco stated she found the Blackberry next to the computer on the desk. She confirmed that the Blackberry was not password protected. When the Blackberry was found, icons on the screen indicated that it had a signal, and the phone bill found at the scene indicated that it was active and could be used. However, Detective Cisco explained that she turned the signal off when she began examining the phone in the lab to prevent anyone from remotely wiping the data stored on the phone. Detective

---

[6] A sim card is a microchip issued by the phone company that is inserted into the phone and provides the subscriber's information. Detective Cisco explained that not every phone company issues sim cards for modern phones.

[7] A micro SD card is a "small portable storage device" that is inserted into a phone and can also be inserted into a digital camera or computer. It stores data such as applications for the phone, text messages, videos, papers, emails, et cetera. Detective Cisco explained that the SD card would store "anything that you wanted to save." Each phone is different, and what data is stored on the SD card simply depends on how the phone is set up.

Cisco explained that she came to the conclusion that the Blackberry had cellular service when she found it because of a symbol that appeared on the phone's screen that she understood to mean the phone had cellular service. When she turned the signal off in the lab, that symbol no longer appeared on the phone's screen. But, in order to determine if the phone had cellular service on one day but not another, Detective Cisco said she would have to examine the phone bill.

ICAC Detective Brett Kniss testified that he was trained to conduct computerized forensic examinations and had completed "undercover chat training," during which he learned how to create fictitious Facebook accounts and pose as a minor to entice suspects. Through that process, he learned how Facebook operates. Additionally, Detective Kniss had reviewed the law enforcement manual published by Facebook.

When Detective Kniss received the victim's laptop from Detective Foster, he examined the hard drive for evidence of chats and photos that were allegedly sent by the Defendant. Detective Kniss explained that a Facebook chat can be sent between users who are already "Facebook friends" and operates like an instant message, allowing users to communicate in real time via the Facebook server. Chats can be "cleared" by the user and deleted off their Facebook page. Once the chats are deleted, the user cannot access the chats via their Facebook account. However, Detective Kniss was able to retrieve evidence of the chats from the hard drive of K.P.'s computer. Along with the content of the chat, Detective Kniss recovered the user ID numbers for the Facebook accounts, the sender and receiver of each chat message, and the date and time each chat message was sent. Detective Kniss copied all of the chats between K.P. and a Facebook account bearing the Defendant's name into an Excel spreadsheet so they could be organized chronologically.

K.P.'s and the Defendant's names were listed as the user names associated with the Facebook accounts in the chats found on K.P's hard drive. Detective Kniss verified the Defendant's user name and user ID number through records from Facebook. Detective Kniss also used an undercover Facebook account to find the Defendant's Facebook account and verified that the profile picture and the user ID associated with that account matched the picture and user ID recovered from the chats on K.P.'s laptop. Additionally, the Hotmail email address was displayed on the Defendant's Facebook account.

During her interview with Detective Kniss, K.P. had described a photo of a black man's penis that the Defendant allegedly sent to her. Detective Kniss found a photo consistent with K.P.'s description during a search of the hard drive of K.P.'s laptop. The

time-date stamp[8] on the image also matched the date and time of the chats found on K.P.'s computer. Similarly, the log in records for K.P.'s email account corresponded with the time-date stamp on the image.

K.P. also told Detective Kniss about photos she had sent to the Defendant's Hotmail email address provided to K.P. in the Facebook chat. Detective Kniss found photos matching the description given by K.P. during his search of the hard drive of K.P.'s laptop. Detective Kniss discovered that the email address on the Defendant's résumé found during the execution of the search warrant was the same email address to which K.P. had been directed to send photos.

Detective Kniss testified that the desktop computer found at the Defendant's home accessed the internet, email, and Facebook through an unsecured internet signal[9] in the neighborhood.

Detective Kniss also searched the Defendant's computer hard drive for Facebook chats between the Defendant and K.P., and he found the "exact" chats that he had previously found on K.P.'s computer—the user IDs, names, dates, and times all matched the chats found on K.P's computer. All the chats bore the names of the Defendant and K.P.

In a chat starting at 11:10 p.m. on June 11, 2010, and continuing into the early hours of June 12, 2010, the sender opened the conversation by referring to K.P. by a nickname and asking about several members of her family. The sender also asked, "What time are y'all leaving in the morning? Ain't the trip tomorrow?" K.P. responded by saying, "The trip ain't tomorrow." The sender also asked K.P. whether she played Mafia Wars. Several times in the chat, the sender referenced that he or she was aware of K.P.'s age and that he or she was worried about getting into trouble for his conversations with her. Throughout their conversation, the sender repeatedly asked to K.P. to delete their chat and expressed apprehension about the consequences that could come from conversations with K.P.

Eventually, their conversation turned to sexual topics. The sender asked K.P to describe her pubic hair; whether she was aroused; and whether she would perform oral and vaginal sex. In the midst of this conversation, the sender also wrote, "You young and you

---

[8] Every time a computer receives an image, either from the internet or sent directly from another person, the computer automatically creates a time-date stamp for the image file, noting when the computer received it.

[9] An unsecured internet signal means that the signal is not password protected and anyone within the range of the signal can use it to access the internet.

my cuz [sic]. Yeah, for you I could get locked up." Detective Kniss understood this communication to mean that the sender knew K.P. was underage and also that the sender was related to K.P. The sender and K.P. also discussed how they might meet in person. The sender suggested that K.P. tell her mother that she wanted to "go hang with [K.W.]"[10] At the time, the Defendant had a stepdaughter named K.W. who lived in his home.

The sender asked K.P. to send photos of her vaginal area to the Defendant's Hotmail email address. K.P. refused and told the sender she was not comfortable sending such photos. Even though K.P. refused to send the photos of her vaginal area as the sender requested, the chats indicated that she did send some photographs to the Hotmail email address. When the sender received one of the photos, he or she responded, "Come on. What's that? Do better . . . Take the same pic, but take your clothes off." The sender also instructed K.P., "You need to finger f*** yourself right now and tell me when you [sic] coming [sic] . . . When you come [sic] on your fingers, take a [p]ic of your fingers so I know you did it." The sender asked K.P. to send that photo to the Hotmail email address. The chat ended at 3:04 a.m. on June 12, 2010.

Detective Kniss recovered two photos from the Defendant's computer hard drive that were consistent with the photos K.P. sent to the person in the chat. The first photo showed K.P. looking into a mirror wearing an undershirt. The second image depicted K.P.'s fingers held up for the camera.[11] Both photos were placed on the Defendant's computer on June 12, 2010, and according to the time-date stamp, they were last accessed on that computer around 2:30 a.m on June 12, 2010. The same photos were recovered from K.P.'s hard drive. The time-date stamps on the photos found on K.P.'s hard drive correspond with the time she was chatting with the sender on June 12, 2010.

At 1:06 a.m. on June 13, 2010, the sender initiated another Facebook chat and told K.P. to "call [K.W.] tomorrow night." Again, the sender indicated that he or she knew K.P. was 14 years old and expressed concern that their conversations would be discovered. The sender also repeatedly tried to get K.P. to send him or her a photo of her vaginal area, but K.P. refused and expressed discomfort with sending such photos. In this conversation, the sender offered to send K.P. a photo of his or her genitalia and described sex acts he or she would like to perform with K.P. The sender also said:

---

[10] In the interest of protecting the privacy of a minor, we elect to refer to K.W. and her brother, D.W., by their initials.

[11] K.P. told Detective Kniss during her interview that she had put lotion on her fingers to "simulate the wetness," held up her fingers to take the photo, and sent that photo to the Hotmail email address.

Sees [sic], what you don't realize is that because we're fam you can always come over always and it couldn't never end, just f*** and f*** and f***. You can't do that with no other guy and get away with it, but with me. Feel me? See, she trust [sic] you over here, and so what better place to be and get what you want when you want it and we got all summer to f*** as many times as possible.

According to the time-stamps, that chat ended at 2:09 a.m. on June 13, 2010.

At 12:07 a.m. on June 14, 2010, the sender initiated yet another Facebook chat with K.P. The sender asked K.P. to meet in person, and K.P. suggested that she tell her mother that she was visiting the Defendant's home. Detective Kniss explained that this conversation indicated that K.P. knew the sender; was familiar with the location of the sender's home; and that her mother would be comfortable letting her visit the sender's home. The sender replied, "Yeah, that's cool. Tell her you coming to hang out with [K.W.] and friends." Again, the sender asked K.P. to send a photo, to which she replied, "I ain't sending another one. You already got three[,]" and "My bad for getting tired of sending you pics." The sender asked K.P. if she wanted a "pic of this" and asked K.P. for her email address. K.P. responded by giving the sender her email address.[12] The sender then indicated that a photo of a flaccid penis was sent to K.P. The last chat message Detective Kniss was able to recover was sent at 12:54 a.m. on June 14, 2010.

Detective Kniss recovered a photo of a man's penis from K.P.'s computer hard drive. That photo was placed on K.P.'s computer at 12:41 a.m. on June 14, 2010. Detective Kniss explained that the time-date stamp on the photo correlated with the date and time of the chat during which the sender asked if K.P. wanted a "pic of this" and asked for her email address. Additionally, the same photo was recovered from the micro SD card in the Blackberry seized during the search of the Defendant's home. The photo had been deleted from the Blackberry, but Detective Kniss was able to retrieve it in the ICAC lab.

On cross-examination, Detective Kniss admitted that, even though he could identify which account the chats were sent from, he had no way of determining who actually sent the messages. Additionally, Detective Kniss confirmed that the data on the micro SD card indicated that the micro SD card has been transferred from another device into the Blackberry. Therefore, photos found on the card could have been taken on another device before the micro SD card was placed into the Blackberry. Detective Kniss explained that he did not dust the micro SD card for fingerprints because the dust could have damaged the data

---

[12] Detective Kniss noted that this portion of the chat was the same as the screen shot taken by Ms. Conley and given to the Spring Hill Police Department.

stored on the card. The micro SD card was not tested for fingerprints after the data from it was recovered.

Detective Kniss admitted that it would not be unusual for a person trying to "groom"[13] a child to set up a fake Facebook account. However, Detective Kniss stated that he did not see any indications of a fake account on the Defendant's computer. Detective Kniss was not able to determine if multiple people used the computer. Based on the language and references to "cousins" and "family" in the chats, Detective Kniss concluded that K.P. and the sender were familiar with each other. However, he said other people would also know about the familial relationship between K.P. and the Defendant.

With regard to the photo of the penis found on K.P.'s computer and the Defendant's Blackberry, Detective Kniss noted that there were no identifying features in the photo other than the red shorts pulled down around the subject's legs. Detective Kniss admitted that he did not search the Defendant's home for shorts matching those seen in the picture. Likewise, he did not visually examine the Defendant's penis to see if it was consistent with the penis depicted in the photo. He also did not conduct an internet search to determine whether the photo was a "stock" photo. However, Detective Kniss stated that he believed the email with the photo was sent from the Blackberry because he did not find any evidence on the Defendant's computer indicating that the email was sent from the computer.

Detective Kniss also confirmed that, because the Defendant was using an unsecured internet connection in his home, someone with sufficient technological expertise could intercept all the data sent and received on that network. If information about the Defendant's passwords or account information had been intercepted, another person could access the Defendant's email and Facebook from another computer. In short, Detective Kniss explained that he could verify that the Defendant had access to the computer and Blackberry that were used to send Facebook chats and email the photo of the penis, however, he did not know who was "sitting behind the computer or utilizing [the Blackberry] to send these messages." At most, the chats indicated "that the person utilizing the computer, sending the chat message, had an intimate knowledge about [the Defendant], being his account, his email, knowledge of [K.P.'s] family." Detective Kniss admitted that, if someone had been monitoring the Defendant long enough, they could have received the information discussed in the chats.

---

[13] Detective Kniss explained that, in his experience investigating these types of crimes, he would expect to see the suspect "grooming" the victim. Grooming could include giving gifts to the victim, befriending the victim, acting in a semi-parental role or as someone to look up to, and trying to gain the victim's trust.

On redirect-examination, Detective Kniss confirmed that identifying the person who actually authored messages sent to minor victims was "the nature of the beast" in cases involving electronic means. In this case, Detective Kniss did not find any indication that someone had intercepted the Defendant's computer activity. Had he found any such evidence, Detective Kniss would have investigated further. Detective Kniss explained that he believed the Defendant was the author of the chats because: (1) the time-date stamps on the photos correspond with the times the chats occurred; (2) the chats and photos were found on devices to which the Defendant had access, namely the computer found in the master bedroom and the Blackberry, and those devices were found in close proximity to each other; (3) the photo of the penis was consistent with the Defendant because it was a photo of a black male; (4) the Hotmail account referenced in the chats was also found on the Blackberry and the Defendant's computer; and (5) that Hotmail account was open on the computer when the search warrant was executed.

Sergeant Eric Anderson testified that he worked with ICAC in 2010. He interviewed the Defendant when officers executed the search warrant on the Defendant's home. During that interview, the Defendant told Sergeant Anderson that there was only one working computer in the home and it was located in the master bedroom. He also confirmed that he had a T-Mobile cell phone but claimed that it had been inactive for about three months due to nonpayment. Sergeant Anderson stated that he did not recall asking the Defendant about the T-Mobile bill found in the master bedroom.

During his interview, the Defendant admitted to having a Facebook account as well as Yahoo, Gmail, and Hotmail email accounts. He claimed that he "was hardly on [Facebook]" and mentioned that he used it to play a game called Mafia Wars. He also used Facebook to chat with friends and had uploaded a few photos to his profile. On the Monday evening prior to the execution of the search warrant, June 14, 2010, the Defendant claimed that he and his wife were in bed by 10:00 p.m. No one else used the computer in the master bedroom after that time. The Defendant stated that the computer was password protected. On cross-examination, Sergeant Anderson confirmed that the Defendant was cooperative during the execution of the search warrant and that the Defendant denied participating in the Facebook conversations with K.P.

K.P. testified that she was 14 years old at the time of the offenses and that the Defendant was her second cousin. She had a Facebook account set up under her name and a Yahoo email address. She recalled chatting with the Defendant on Facebook on "two or three nights" in June 2010. K.P. stated that she was uncomfortable with the sexual nature of the chats and was "confused for the most part." K.P. affirmed that she was "just going along with it."

-10-

In those chats, K.P. was asked to send naked photos of herself, but she refused. However, she admitted that she sent three photos of herself to the Hotmail account—two photos of herself clothed and one photo of her fingers after she had been instructed to masturbate. In return, K.P. received a photo of a penis, which she deleted. K.P. identified copies of the chats previously admitted into evidence as the chats that she had participated in with the Defendant and confirmed that they accurately reflected her conversations with the Defendant.

On cross-examination, K.P. affirmed that the Defendant had never made sexual comments toward her before the Facebook chats. Additionally, at the time the chats took place, K.P. recalled that the Defendant lived with his former wife and her two children. On redirect-examination, K.P. explained that, in June of 2010, her family was scheduled to take a trip to Holiday World. This trip had become an annual family event, and other members of her family would have been aware of it. K.P. confirmed that the trip was referenced in the chats. On recross-examination, K.P. confirmed that she had also told other kids at her school about the trip.

Nekia Wilson testified that she was married to the Defendant, but they had been separated for almost three years. At the time of the offenses, Ms. Wilson lived in a home with the Defendant and her two children. There were two computers in the house—a desktop computer and a non-functioning laptop. The desktop computer was located in the master bedroom and was primarily used by the Defendant. The Defendant used the computer to access Facebook and play games, including a game called Mafia Wars. The Defendant had a Facebook account under his own name.

Ms. Wilson stated that she had her own Facebook account as well. However, she did not use the desktop computer to access her account because she "could never remember the password." Ms. Wilson explained that she had known the password to the desktop computer at one time, but after new software was installed on the computer, the password was changed and she was not able to access the computer with the old password. Ms. Wilson confirmed that the new software had been installed before the police executed the search warrant. Often, Ms. Wilson would wake up late at night, and the Defendant would be using the desktop computer. The Defendant had multiple email accounts, but Ms. Wilson said that she did not have access to those accounts because she did not know the passwords.

Ms. Wilson did not recall her children using the desktop computer. Instead, they used the computer at their grandmother's house because it was faster than the desktop. Additionally, the children had a "netbook" that they would take back and forth between Ms. Wilson's home and their grandmother's home. Ms. Wilson accessed the internet using her Blackberry. She explained that both she and the Defendant owned Blackberries, but her

-11-

Blackberry had service through Sprint. The Defendant's Blackberry had service through T-Mobile.

Ms. Wilson also described the Defendant's penis to the jury and identified the photo sent to K.P. as a photo of the Defendant's penis. She explained that she could identify it as such based on the way the pubic hair was groomed and the discoloration of the skin. She was also able to identify red fabric in the photo as being either the blanket on her bed or red shorts she had purchased for the Defendant. Moreover, Ms. Wilson stated that she believed the Defendant had previously sent her the same photo.

Raymond Gordon, the Defendant's stepfather, testified that he knew the Defendant to be an honest person. He noted that the Defendant had separated from Ms. Wilson, and their relationship was "not friendly." He further stated that he had seen K.P. at the Defendant's home on several occasions and he had never seen the Defendant behave inappropriately toward her.

Betty Gordon, the Defendant's mother, testified that the Defendant was currently living with her and her husband. The Defendant moved in when he and his wife separated, and she noted that their separation was "not friendly." Ms. Gordon had observed the Defendant on the computer looking for jobs and buying car parts. She admitted that the Defendant had a Facebook account and that she was his "Facebook friend." Ms. Gordon stated that she felt that the Defendant had been honest with her. She also stated that she had never seen the Defendant engage in conduct that would cause her concern.

On cross-examination, Ms. Gordon confirmed that there was a laptop computer in the Defendant's home when he lived with his wife. However, Ms. Gordon claimed that she did not see a computer in the master bedroom of the home. Finally, she confirmed that the Defendant had a Blackberry, but she claimed that "[i]t was off more than it was on."

Lonnita Anderson, the Defendant's current girlfriend, testified that she had a daughter who was seven years old. The Defendant had never engaged in conduct that caused Ms. Anderson to feel concerned for her daughter. She stated that the Defendant had always been honest with her. On cross-examination, Ms. Anderson admitted that she had only known the Defendant for a short period of time and that they did not live together. She stated that the Defendant had a Facebook account but claimed he was "never on Facebook."

The Defendant testified that, at the time of the charged offenses, he lived in a home with Ms. Wilson and her two children, K.W. and D.W. At the time, the Defendant had been laid off from his job, and over the course of a typical day, he would be on the computer, searching Career Builders, "filling out" résumés, and emailing people trying to find a job.

-12-

Prior to being laid off, the Defendant traveled frequently for work, and he and Ms. Wilson would send nude photos of themselves to each other while he was away.

The Defendant admitted that he had a Facebook account in June 2010. He also stated that other people in the house had their own Facebook accounts. The Defendant primarily used his Facebook account to communicate with his brother in Baton Rouge and to play a game called Mafia Wars. The Defendant admitted that he would sometimes chat with friends. However, he denied ever chatting with or sending photos to K.P. He claimed the photo sent to K.P. was not a photo of his penis. Additionally, he claimed that he had never received any emails from K.P.

The Defendant accessed the internet through an unsecured network. Additionally, he stated that all of his passwords were "remembered" so that he did not need to type in his password when he logged into an account and that "anybody else that got on that computer didn't have to sign in to get into [his] Facebook." The Defendant claimed that everyone in the home had access to and used the computer in the master bedroom; the password to log into the computer was posted on a Post-It note on top of the computer.

The Defendant asserted that he had no cell phone service during the time someone was sending chats to K.P. because he had not paid his cell phone bill. The Defendant noted that his Blackberry had a micro SD card, but he claimed that the card came with the phone and had never been removed from the phone. However, he noted that anyone who lived in the house had access to the phone.

On cross-examination, the Defendant explained that the icons on his Blackberry screen would show that he had strong tower signal even when the phone service was cut off. He admitted that there was a T-Mobile bill sitting on his computer stand when police executed the search warrant and that he received a text message from T-Mobile on June 12, 2010, which read, "To continue your monthly service as of 07/27/2010, you must pay $159.76 before 06/26/2010. If not paid, all minutes will be debited from your FlexAccount." However, later in his testimony, the Defendant said he did not think he had cell phone service at the time of the offenses, but he was not sure. He also admitted that he made an outgoing call to a friend on June 26, 2010, and that such a call may have meant that he had phone service at the time of the offenses.

The Defendant admitted that the Hotmail account belonged to him. The Hotmail account was also set up to send emails to his Blackberry, and it was the email address associated with his Facebook account. The Defendant noted that Facebook would send an email to his Hotmail account any time he got a "friend request" and he could accept the request without having to go to his Facebook page. Further, the Defendant admitted that

"nine out of ten times," if someone were to send an email to the Hotmail account, he would have seen it. He also clarified that the only password "remembered" on the computer was the password to his Facebook account. His email passwords were not "remembered."

The Defendant admitted that he knew K.P.'s family had scheduled a trip to Holiday World. He further admitted that he had been online the day the search warrant was executed. At the time, he was checking his email and searching for a job.

On redirect-examination, the Defendant said that 20 to 30 people would have known about the family's upcoming trip to Holiday World. He also explained that T-Mobile would send him the text message regarding payment every month regardless of whether he had active service at the time the text message was sent.

Based upon the evidence presented, the jury convicted the Defendant as charged. This timely appeal followed.

## II. Analysis

*Authentication*

On appeal, the Defendant first argues that the chats and email containing a photo of a penis that were sent to K.P. were not properly authenticated because the State failed to exclude the possibility that someone else authored the messages. The State argues that it need not exclude the possibility that someone else wrote the messages sent to K.P. in order to authenticate the messages. In light of the circumstantial evidence surrounding the Facebook chats and emails, the State avers that the trial court did not abuse its discretion by admitting the evidence. We agree with the State.

"Decisions regarding the admissibility or exclusion of evidence are entrusted to the trial court's discretion." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004)). As such, we review the trial court's decision under an abuse of discretion standard. Id. This Court will find an abuse of discretion when the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Tennessee Rule of Evidence 901 provides, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier that the matter in question is what its proponent

claims." Tenn. R. Evid. 901(a). Evidence may be authenticated through, "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4).

A Tennessee appellate court has reviewed authentication of evidence found on social media websites on one other occasion. In Melissa L. Bright Dockery v. Kevin Carl Dockery, Sr., No. E2009-01059-COA-R3-CV, 2009 WL 3486662 (Tenn. Ct. App. Oct. 29, 2009), the Court of Appeals held that MySpace messages were properly admitted at trial when the messages were sent from the defendant to his friend, Ms. Lowe, and she had subsequently printed out their conversation. The trial court admitted the messages based on Ms. Lowe's testimony that she had printed the messages directly from her computer; they showed exactly what she and the defendant said to each other; and each message identified which party to the conversation was making a particular statement. Id. at *6.

Several other jurisdictions have addressed the issue of authenticating electronic and social media communications in more depth. For example, in Griffin v. State, 19 A.3d 415 (Md. 2011), the Court of Appeals of Maryland detailed the concerns surrounding evidence found on social media websites. In that case, the State sought to introduce printouts from the defendant's girlfriend's MySpace profile, which allegedly contained a threat to one of the State's witnesses. Id. at 418. The State tried to authenticate the printouts through an officer's stipulation that he recognized a photo on the page as that of the defendant's girlfriend and the date of birth displayed on the profile was the same date that the defendant's girlfriend gave as her date of birth. Id. at 419. The Court of Appeals of Maryland noted the challenges that arise when trying to authenticate evidence from social media, stating, "The concern arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the username and password." Id. at 421. Therefore, it held that "the picture of [the defendant's girlfriend], coupled with her birth date and location, were not sufficient 'distinctive characteristics' on a MySpace profile to authenticate its printout, given the prospect that someone other than [the defendant's girlfriend] could have not only created the site, but also posted the [purported threat]." Id. at 424.

However, the Court of Appeals of Maryland also outlined a number of possible avenues by which such evidence could be authenticated. Id. at 427. One such option was to "search the computer of the person who allegedly created the profile and posting and examine the computer's internet history and hard drive to determine whether that computer was used to originate the social network profile and posting in question." Id.

Other courts have held that evidence derived from social media and emails was sufficiently authenticated when the prosecution offered circumstantial evidence corroborating that the evidence was what its proponent claimed. For example, in In re F.P., 878 A.2d 91 (Pa. 2005), the Supreme Court of Pennsylvania held that transcripts of instant messages between the defendant and the victim were properly authenticated and admitted at trial. Id. at 93. In that case, the defendant assaulted the victim because he believed that the victim had stolen a DVD from him. Id. In the instant message conversations, the defendant identified himself by his first name and threatened physical violence against the victim for stealing from the defendant. Id. at 94. Additionally, after the victim notified school authorities about the threats, staff at the school met with the defendant and the victim regarding the messages and the alleged theft. Id. Approximately the same time as these school meetings, the defendant sent the victim another instant message stating, "u gotta tell tha school shit and stuff like a lil bitch."[14] Id. at 95. In the same conversation, the defendant also threatened, "want my brother to beat ur ass on tha steel center bus" and "want [sic] till I see u outta school ima beat ur aSS." Id. At the adjudication hearing, the defendant's brother testified that he witnessed the defendant beating up the victim after disembarking a school bus that the defendant did not normally ride. Id. The Pennsylvania Supreme Court held that "[a]ll of this evidence, taken together, was clearly sufficient to authenticate the instant message transcripts as having originated from [the defendant]." Id. Further, the court declined to adopt an authentication standard that would require more direct proof of authorship for electronic communications. Id. The court noted that the same uncertainties regarding authorship exist with traditional written documents and held, "We believe that e-mail messages and similar forms of electronic communication can be properly authenticated within the existing framework of Pa. R. Ev. 901 and Pennsylvania case law." Id.

Additionally, in Commonwealth v. Purdy, 945 N.E.2d 372 (Mass. 2011), the Supreme Judicial Court of Massachusetts held that email exchanges were properly authenticated. Id. at 376. In that case, the defendant was accused of running a house of prostitution out of his combination "hair salon, antique store, art studio, and massage parlor." Id. at 372, 377. The email exchanges admitted into evidence were found on the hard drive of a computer that admittedly belonged to the defendant. Id. at 378. One email exchange was initiated from the defendant's email account; was signed with the defendant's name and the address of his business; and described the author of the email as a "working artist, as well [as an] entrepreneur, small business guy, hairstylist, art and antiques dealer, [and] massage therapist," and added, "and I operate a service." Id. Other email messages were initiated from the defendant's account and bore the defendant's name as the signature. The defendant argued that the computer was located in an area where his employees could access it, and the

_____

[14] In the interest of accuracy, the Pennsylvania Supreme Court left excerpts from the instant messages unaltered and uncorrected for grammatical errors. In re F.P., 878 A.2d at 94 n.5.

defendant claimed his employees frequently used the computer and "used his e-mail account to play pranks on him, and that they answered e-mails in his name." Id. at 378. The court held that, even though the prosecution had not provided direct evidence that the defendant authored the emails in question, the circumstantial evidence regarding the defendant's knowledge of passwords for the computer, his admitted ownership of the email account, and the fact that the emails originated from the defendant's email address and bore his name was sufficient to authenticate the emails. Id. at 379-80. Further, the court held, "The defendant's uncorroborated testimony that others used his computer regularly and that he did not author the emails was relevant to the weight, not the admissibility, of the messages." Id. at 381-82.

Similarly, in a case analogous to the one before us today, People v. Clevenstine, 891 N.Y.S.2d 511 (N.Y. App. Div. 2009), the New York Supreme Court, Appellate Division, held that sexually explicit MySpace instant message communications between the defendant and the victims were properly authenticated at trial. Id. at 514. In that case, both victims testified that they had discussed sexually explicit topics via the MySpace instant messaging service; state police had recovered copies of those instant messages from the hard drives of the victims' computers; the defendant's wife recalled finding sexually explicit conversations on the defendant's MySpace account; and a representative from MySpace testified that the accounts participating in the instant messages had been created by the victims and the defendant. Id. At trial, the defendant suggested that someone else had accessed his account and sent the message, but the court stated that "the likelihood of such a scenario presented a factual issue for the jury." Id.

Finally, in Tienda v. State, 358 S.W.3d 633 (Tex. Crim. App. 2012), the Texas Court of Criminal Appeals likewise affirmed the introduction of MySpace postings based on circumstantial evidence used to authenticate the postings. Id. at 642-45. In that case, the defendant also suggested that someone else had created or accessed the MySpace account and argued that the State had failed to authenticate the messages as coming from the defendant. Id. at 636. In response, the court held:

> Conceivably some unknown malefactors somehow stole the appellant's numerous self-portrait photographs, concocted boastful messages about David Valadez's murder and the circumstances of that shooting, was aware of the music played at Valadez's funeral, knew when the appellant was released on pretrial bond with electronic monitoring and referenced to that year-long event along with stealing the photograph of the grinning appellant lounging in his chair while wearing his ankle monitor. But that is an alternate scenario whose likelihood and weight the jury was entitled to assess once the State had produced a prima facie showing that it was the appellant, not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages.

Id. at 646.

Comparing the facts of this case to cases from other jurisdictions, we conclude that there was more than sufficient circumstantial evidence to authenticate the Facebook chats and emails in question. The Defendant admitted that the Facebook account used to send the chats belonged to him. Additionally, Detective Kniss independently verified that the Facebook account belonged to the Defendant by comparing the Facebook profile picture, user ID number, and associated email address with those of the Facebook account that sent chats to K.P. Transcripts of the "exact" same chats were found on both the Defendant and K.P.'s computer hard drives.

With regard to the emailed photographs, the Defendant admitted that the Hotmail account belonged to him and that the password to the account was not "remembered," requiring someone to enter a password each time they logged into the account. Further, it was the same email address to which the sender instructed K.P. to send photos. The Hotmail email address was also associated with the Defendant's Facebook account and tied to the T-Mobile Blackberry. Additionally, the same Hotmail account was open when police executed the search warrant, and the Hotmail email address was listed on the Defendant's résumé. Photos sent via email by K.P. were found on the Defendant's computer, and the photo of a black man's penis was found on the Defendant's Blackberry, as well as K.P.'s computer hard drive. The time-date stamps of the photos matched the times the chats were sent to their respective recipients.

In light of all this evidence, we hold that the trial court did not abuse its discretion when it admitted the chats and the emailed photograph of a penis. To the extent that the Defendant argues that the State was required to affirmatively prove that the Defendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility. See Tienda, 358 S.W.3d at 646; Purdy, 945 N.E.2d at 381-82; Clevenstine, 891 N.Y.S.2d at 514.

Within the Defendant's challenge to the authentication of the Facebook chats and emails, he argues that the communications were inadmissable hearsay because the State failed to prove the Defendant was the author of the messages. However, his argument is waived because he made no hearsay objection to their introduction at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

*Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the evidence solely as to the issue of whether he was the actual author of the chats and email containing the photo of a penis. The

Defendant argues that evidence was not sufficient to prove he was the author because the devices used to send the messages were not exclusively under his control and other individuals could have accessed his account. The State argues that direct evidence of authorship was not required and that the circumstantial evidence presented at trial was sufficient to support the jury's verdict. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This Court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the accused as the person who committed the offense for which he is on trial is a question of fact for the jury. State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). The identity of an accused may be established either by direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975).

To borrow a phrase from the trial court, this case contains a "plethora of circumstantial evidence" showing that the Defendant was the author of the communications with K.P. The chats were sent to K.P. late at night from a computer located in the Defendant's bedroom. The email containing the photo of a penis was also sent late at night from a separate device, and the photo was found on the Defendant's T-Mobile Blackberry. The Defendant's wife testified that the computer's password had been changed and she could no longer access the computer and that her children generally did not use the computer. While the computer was connected to the internet through an unsecured network, there was

-19-

no indication that someone had hacked into the Defendant's accounts in order to communicate with K.P. Finally, in the chats themselves, the sender notes a familial relationship between the sender and K.P.; references K.P.'s upcoming family trip to Holiday World of which the Defendant was aware; and asked K.P. whether she played Mafia Wars, a game the Defendant often played. At trial the Defendant vigorously argued that someone else had gained access to his Facebook and Hotmail accounts and sent the messages and photos to K.P., but the jury clearly discredited his account of the events by returning a guilty verdict. Based on the evidence presented, we conclude that there was sufficient evidence for the jury to conclude that the Defendant was the author of the chats and email containing the photo of a penis and that his identity as the perpetrator of the offenses was established.

*Testimony Regarding Stepdaughter's Fake Facebook Profile*

Finally, the Defendant argues that the trial court erred by prohibiting the Defendant from referring to a fake Facebook profile created by the Defendant's stepdaughter. By prohibiting questions about said profile, the Defendant contends that the trial court denied him the right to "completely and effectively interrogate witnesses to elicit material evidence to support the Defense theory." The State argues that the issue is waived because the Defendant failed to provide citations to the record or include portions of the transcripts in the record that may have contained substantive discussions of the issue. Alternatively, the State asserts that the trial court did not abuse its discretion in excluding such evidence because it was not relevant to the issues presented at trial and the Defendant was still able to argue that the State could not prove he was the author of the messages.

Under the rules of this Court, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Additionally, the Defendant bears the burden of preparing a record which conveys "a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal." Tenn. R. App. P. 24(b); State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). When there was an evidentiary hearing regarding the issue presented for review, a transcript of the hearing must be included in the record. State v. Bennett, 798 S.W.2d 783, 789 (Tenn. Crim. App. 1990). Allegations contained in pleadings, counsel's arguments and statements of facts contained in a brief or similar pleading, and counsel's statements made in open court are not evidence. Id.; State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

When the record does not contain a transcript of the proceedings relevant to the issue presented for review, this Court is precluded from considering the issue. State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); Roberts, 755 S.W.2d at 836; State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981). In such cases, this Court conclusively presumes that the

evidence supports the trial court's ruling.  In re M.L.D., 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005); Roberts, 755 S.W.2d at 836; State v. Baron, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); Taylor, 669 S.W.2d at 699.

In this case, the Defendant has failed to provide any citations to the record to support his argument on this issue.  Additionally, the trial court's ruling on the issue is not clear from the record.  The State filed a pretrial motion in limine regarding the stepdaughter's fake Facebook profile, but the record on appeal does not contain an order on the motion.  Before trial, the trial court commented on the evidence:

> My only thought on [the stepdaughter's fake Facebook account] is simply that I wouldn't make reference to it in the opening statement or in voir dire.  If you want to bring it up on cross-examination or during your case in chief make sure you lay the proper foundation.

> So I'll just reserve that motion until we get to trial and I can hear the evidentiary basis for whatever the question is being asked about that.

Further, it appears that the jury-out hearings were not requested to be included in the transcripts of the trial, and we have no means to determining whether the issue was discussed at that time.  The issue did arise during the Defendant's testimony when the Defendant stated that his stepdaughter had a Facebook profile in which she posed as a man.  The State objected and in a bench conference said, "This went specifically to the State's motion in limine and it is a blatant, blatant violation of the Court's *previous order* that it was not to be referenced without asking for prior Court permission" (emphasis added).

It is unclear from the record whether the trial court made a final ruling on the admissibility of the Defendant's stepdaughter's fake Facebook profile—the trial court's pretrial comment simply instructed the parties to lay a proper foundation for the testimony before it could be heard.  However, the State's objection during the Defendant's testimony suggests that the trial court had made a ruling on the matter.  There's no indication in the record that the trial court made any further ruling on the issue, and we have no way of determining whether such a ruling was made during the jury-out hearings that were not included in the transcript.  Therefore, because the Defendant bears the burden of preparing a record which conveys "a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal" and failed to provide citations to the record to support his argument, we conclude that the Defendant waived the issue.  See Tenn. R. App. P. 24(b);  Tenn. Ct. Crim. App. R. 10(b).

Waiver notwithstanding, the Defendant's argument is without merit because he fails to explain with specificity how testimony regarding his stepdaughter's fake Facebook account was relevant to the issues presented at trial. The Defendant claims that testimony about the fake profile should have been admitted "to support the Defense theory." We gather from his brief that, at trial, the Defendant wanted to assert either that someone created a fake Facebook profile under his name and communicated with K.P. or someone accessed his Facebook account and posed as him while chatting with K.P.

The Defendant correctly states that individuals accused of a crime are entitled to present evidence that someone else committed the crime. Sawyers v. State, 83 Tenn. 694, 695 (1885). However, such evidence must be presented in accordance with the Tennessee Rules of Evidence. State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003). Under Tennessee Rule of Evidence 401, evidence must "tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, irrelevant evidence is not admissible at trial. Tenn. R. Evid. 402.

In this case, there was no dispute at trial that the Facebook chats were sent from the Defendant's own Facebook profile; he admitted as much during his testimony. The Defendant did not argue that his stepdaughter authored the messages sent to K.P. or sent K.P. the photo of the penis. Therefore, we cannot determine how testimony regarding the stepdaughter's fake Facebook profile would have been relevant to his defense that he was not the author of the chats with K.P.

Further, the Defendant clearly asserted at trial that someone had gained access to his Facebook account and impersonated him in the chats with K.P. Throughout the investigation and trial, the Defendant categorically denied chatting with K.P. or sending her emails. Moreover, he elicited testimony from multiple witnesses that the chats were inconsistent with his previously observed behavior toward the victim. Additionally, multiple witnesses admitted that they could not confirm that the Defendant was the individual who had authored the communications sent to K.P. Even without testimony about the stepdaughter's fake Facebook profile, the Defendant clearly was able to defend himself against the charges on the ground that the State could not prove his identity as the author beyond a reasonable doubt. Therefore, we conclude that this issue is without merit.

### III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE